IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

GEORGE THAMMAVONG                                                    PLAINTIFF

v.                         Civil No. 2:20-cv-02051-PKH-MEF

ANDREW M. SAUL, Commissioner
Social Security Administration                                      DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, George Thammavong, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

## I.      Procedural Background

Plaintiff filed his applications for benefits on April 12, 2017, alleging an onset date of April 10, 2017, due to congestive heart failure, cardiomyopathy, diabetic retinopathy, diabetes, obstructive sleep apnea, depression, hypertension, and high cholesterol.  (ECF No. 15-3, pp. 2-4, 17-18).  Plaintiff was 34 years old when he filed his applications.  (ECF No. 15-3, p. 3).  He had past relevant work as an appliance assembler, a shipping clerk, and a floor distributor or utility worker.  (ECF No. 15-2, p. 21; ECF No. 15-3, pp. 3-4).  The Commissioner denied Plaintiff's applications initially and on reconsideration.  At Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on December 12, 2018.  (ECF No. 15-2, pp. 35-78; ECF No. 15-4, p. 18).  Plaintiff was present and represented by counsel.

On May 22, 2019, the ALJ found Plaintiff had the following severe impairments: dilated non-ischemic cardiomyopathy and cardiomegaly, status post-automatic implantable cardioverter-defibrillator ("ACID") placement; diabetes mellitus; obstructive sleep apnea; obesity; osteoarthritis; hypertension; chronic sinusitis; and a history or bilateral carpal tunnel surgery. (ECF No. 15-2, p. 14, Finding 3).  The ALJ concluded, however, that the impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (ECF No. 15-2, p. 16, Finding 4).  The ALJ determined Plaintiff retained the RFC to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can only occasionally climb ramps and stairs and can never climb ladders, ropes, or scaffolds; the claimant can frequently, but not constantly, handle and finger bilaterally; and the claimant must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gasses, poor ventilation, and hazards, including no driving as a part of work.  (ECF No. 15-2, p. 17, Finding 5).

With the assistance of a vocational expert ("VE"), the ALJ found Plaintiff could perform work as a charge account clerk, credit card call-out operator, and document preparation clerk. (ECF No. 15-2, pp. 22-23).  The ALJ concluded that Plaintiff had not been under a disability as defined by the Act during the relevant period.  (*Id*., p. 23).

The Appeals Council denied Plaintiff's request for review on February 4, 2020.  (ECF No. 15-2, pp. 2-7).  Plaintiff then filed this action on April 3, 2020.  (ECF No. 2).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 17, 18), and the case is ready for decision.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial

evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. The disability determination process is not an adversarial process; instead, the Commissioner's duty exists alongside the claimant's burden to prove his case. *See Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.     Relevant Medical Evidence

On December 1, 2016, Plaintiff presented to Sparks Clinic Lung Center for a sleep apnea consultation under the care of Arturo Meade, M.D.  (ECF No. 15-7, p. 5).  Plaintiff reported he "wakes up not refresh, snores loud, wakes up gasping and choking."  (*Id.*, p. 7).  Plaintiff also reported he wakes up 10 times or more and gets out of bed at 3 a.m.  (*Id.*).  Dr. Meade assessed Plaintiff with Obstructive Sleep Apnea syndrome ("OSA") and noted he would schedule a sleep test and CPAP if needed.  (*Id.*, p. 8).

Plaintiff went to Sparks Cardiology Center for a follow-up appointment on May 5, 2016. (ECF No. 15-7, p. 60).  Abdul-Nasser Adjei, M.D., noted Plaintiff's ejection fraction was less than 20%, and he assessed that Plaintiff "is doing clinically well," and in New York Heart Association class II.  (*Id.*, p. 61).

After receiving an echocardiogram report on May 23, 2016, Dr. Adjei found Plaintiff's left ventricle mildly dilated and severe global hypokinesis of LV.  (ECF No. 15-7, p. 70).  Dr. Adjei also noted Plaintiff's "[o]verall left ventricular systolic function is severely impaired with, an

EF<20%." (*Id*.).  Plaintiff's left atrium was moderately dilated, and his right atrium was mildly enlarged. (*Id*.).

On July 19, 2016, Plaintiff went to Sparks Regional Medical Center for a chest x-ray. (ECF No. 15-7, p. 115).  Jennifer Fox, M.D., noted that Plaintiff's heart size was enlarged, and she found placement of dual lead left subclavian pacemaker/ACID with right atrial and right ventricular leads. (*Id*.).  There was no lobar consolidation, pleural effusion, or pneumothorax. (*Id*.).  Dr. Fox's impression of Plaintiff was Cardiomegaly, placement of a dual lead left subclavian pacemaker/ACID, and no pneumothorax. (*Id*.).  The same date, Plaintiff's ICD implantation report indicated: primary prevention; cardiomyopathy (non-ischemic cardiomyopathy); congestive heart failure (New York Heart Association Class 2-3); coronary artery disease; and tachycardia. (ECF No. 15-7, p. 123).

A post pacemaker placement chest x-ray was done the next day, July 20, 2016. (ECF No. 15-7, p. 114).  According to the exam, Plaintiff's cardio mediastinal silhouette was enlarged, but pulmonary vasculature was within normal limits, and there was no lobar consolidation, pleural effusion or pneumothorax. (*Id*.).  The impression was "[c]ardiomegaly with no acute radiographic abnormality." (*Id*.).

On July 26, 2016, Plaintiff presented to Sparks Cardiology Center for an internal cardiac defibrillator procedure. (ECF No. 15-7, pp. 53-54).  On July 27, 2016, Plaintiff had an electrocardiogram with normal sinus rhythm 92 rate. (*Id*., p. 58).

On October 14, 2016, Plaintiff went to Cornerstone Family Medical Clinic for high heart rate and high blood sugar. (ECF No. 15-8, p. 22).  Suh Niba, M.D., assessed Plaintiff with the following: type 2 diabetes mellitus with hyperglycemia; congestive heart failure; hyperlipidemia; sleep apnea; cardiomyopathy; major depressive disorder; and morbid obesity. (*Id*., p. 25).  Dr.

Niba advised Plaintiff to continue low salt and low fat, as well as a diabetic diet. (*Id*.). Plaintiff was encouraged to monitor his blood pressure and keep a log. (*Id*.). Dr. Niba recommended Plaintiff exercise adequately and "[a]void OTC NSAIDS except for Tylenol. Weight Control. Patient will need a sleep study." (*Id*.).

Dr. Meade performed a polysomnography on December 13, 2016. (ECF No. 15-7, p. 137). His final impression was, "[o]bstructive sleep apnea with an excellent response to continuous positive airway pressure. (*Id*.). Dr. Meade recommended use of a CPAP at 17 cm of water pressure. (*Id*.). Plaintiff's treatment analysis included total sleep of 5 hours for a sleep efficiency of 98 percent. (*Id*.).

On January 23, 2017, Plaintiff presented to Spark's clinic lung center for a CPAP follow up. (ECF No. 15-7, p. 2). It was noted Plaintiff uses his CPAP and estimated 4 hours of use nightly. (*Id*., p. 4). Plaintiff also reported experiencing mask leaks, trouble with sleep initiation, problems with sleep maintenance, and excessive daytime sleepiness. (*Id*.). Dr. Meade assessed Plaintiff as a "33-year-old obese, with CHF, severe OSA on CPAP at 17 non compliant with sinus congestion." (*Id*.). Plaintiff reported an understanding of the severity of his condition and consequences of untreated obstructive sleep apnea, and he was scheduled for a follow-up appointment. (*Id*.).

On January 25, 2017, Plaintiff returned to Cornerstone Family Medical Clinic for a three-month follow-up appointment. (ECF No. 15-8, p. 18). Dr. Niba opined Plaintiff was compliant in taking medications as directed for anxiety/depression. (*Id*., p. 20). Plaintiff reported his anxiety/depression symptoms were worse in the evening, and his depression/anxiety prognosis was moderate. (*Id*.). His congestive heart failure had not changed since his last visit, and he reported that it interfered with his daily activities. (*Id*.). With respect to his diabetes, he reported

compliance with his medications, follow-up visits, diet, and home glucose monitoring.  (*Id.*).  However, Plaintiff had not had a dietician visit in the last year, and Dr. Niba noted Plaintiff was taking aspirin daily but not seeing an eye doctor yearly.  (*Id.*).  Plaintiff had depression, anxiety, and no irritability.  (*Id.*, p. 21).  Dr. Niba assessed Plaintiff with the following: diabetes mellitus; congestive heart failure; obstructive sleep apnea syndrome; hyperlipidemia; essential hypertension; cardiomyopathy; medication monitoring; morbid obesity; and depressive disorder.  (*Id.*, pp. 21-22).

On February 22, 2017, Plaintiff was seen at Sparks Ear Nose and Throat Center-West for an evaluation of nasal congestion and snoring. (ECF No. 15-7, p. 13).  Regarding Plaintiff's history of present illness, Gary Highfill, M.D., stated the following:

> Patient presents today for evaluation of nasal congestion and snoring.  Nasal steroids made no different.  This all seemed to get worse in February with a sinus infection.  Treat with antibiotics with minimal improvement.  He does have poor dentition and currently on clindamycin with planned dental extraction soon.  Does not tolerate CPAP.  History of dilated cardiomyopathy.  Has ACID and pacemaker. Last echo showed less than 20% ejection fraction.  Last cardiac visit June 27, 2016. Outside notes are reviewed.  New York Heart Association class II congestive heart failure.  Doing very well. (ECF No. 15-7, p. 15).

Dr. Highfill diagnosed Plaintiff with obstructive sleep apnea syndrome; morbid obesity; congestive heart failure; chronic ethmoidal sinusitis; deviated nasal septum; hypertrophy of nasal turbinates; and nasal congestion.  (ECF 15-7, p. 16).  Dr. Highfill noted: "Complete the clindamycin round of treatment on March 10.  Obtain CT of the sinuses with follow-up.  Based on findings further recommendations will be made.  Any surgical intervention would require cardiac evaluation and clearance."  (*Id.*).

A CT Maxillofacial exam was done on March 2, 2017.  (ECF No. 15-7, p. 18).  Jeffrey Ferrell, M.D., found "no air fluid levels to suggest acute sinusitis."  (*Id.*).

On March 30, 2017, Plaintiff went to the Sparks Van Buren Emergency Department with complaints of vision problems and headache.  (ECF No. 15-7, p. 30).  Plaintiff complained of pain to the forehead and right temple.  (*Id*.).  Marshall Newcity, M.D., diagnosed Plaintiff with headache and diplopia (*Id*., p. 33), and Plaintiff was discharged to home in stable condition (*Id*., p. 30).

Plaintiff had a CT of his brain on March 30, 2017.  (ECF No. 15-7, p. 39).  Debra Russell, M.D., opined there was a normal differentiation of the gray and white matter brain parenchyma, no intracranial hemorrhage or area of mass lesion or mass effect, and it was negative non contrast CT brain.  (*Id*.).

The next day, March 31, 2017, Plaintiff presented at Sparks Regional Medical Center.  (ECF No. 15-7, p. 140).  Paula Millard, NP, diagnosed Plaintiff with migraine headache with aura and blurred vision in right eye.  (*Id*., p. 141).  During the visit, it was noted Plaintiff missed an optometry appointment and was encouraged to follow up with his ophthalmologist the following morning.  (*Id*.).

On April 4, 2017, Plaintiff saw Claire Price, M.D., with complaints of floaters in his right eye.  (ECF No. 15-7, p. 25).  He described it as constant, and its severity was described as moderate.  (*Id*.).  Plaintiff's visual acuities under the Snellen method were 20/25 in both eyes.  (*Id*.).  Dr. Price diagnosed Plaintiff with vitreous hemorrhage and vitreous degeneration in his right eye; long term use of oral hypoglycemic drugs; and type 2 diabetes mellitus without complications.  (*Id*., p. 26).  Macular edema was absent, and there was no pathology for diabetic retinopathy.  (*Id*.).  Dr. Price stated, "glasses are <6 months, patient would rather have a medical exam than a vision check."  (*Id*., p. 25).

The same day, Plaintiff went to Magie Mabrey Hughes Eye Clinic for a retina consultation.  (ECF No. 15-7, p. 150).  Cedric Pratt, D.O., diagnosed Plaintiff with type 2 diabetes with

proliferative diabetic retinopathy and macular edema in both eyes. (*Id.*, p. 151). Additionally, Dr. Pratt expressed the following:

> This patient presents with evidence of new PDR with vitreous hemorrhage and DME OD. We will plan to first treat with PRP laser OD. He will likely need PRP OS in the future. Return to clinic 2 weeks to fill in with more laser. (*Id.*, p. 152).

On April 10, 2017, Plaintiff returned to Cornerstone Family Medical Clinic. (ECF No. 15-8, p. 15). Stephen Carney, M.D., found visual changes in Plaintiff's eyes, depression, anxiety, and no irritability. (*Id.*, p. 17). Plaintiff's mental status was normal, and he was active and alert. (*Id.*). His heart auscultation was normal, with no murmurs, rubs, or gallops. (*Id.*). He had a regular heart rate, rhythm, and tachycardia. (*Id.*). Dr. Carney assessed Plaintiff with major depressive disorder, obstructive sleep apnea, type 2 diabetes mellitus without complications, and essential hypertension. (*Id.*, pp. 17-18).

Plaintiff went to the Magie Mabrey Hughes Eye Clinic on April 21, 2017, for a follow-up appointment of type 2 diabetes with proliferative diabetic retinopathy with macular edema in both eyes. (ECF No. 15-7, p. 153). Plaintiff said he never received intravitreal injections in either eye; he reported that his vision was unchanged. (*Id.*). He complained of a headache but stated it had been only a minor nuisance to him. (*Id.*). The floaters went away after first laser treatment, "but within the last 2 days floaters are back. But less than before." (*Id.*). Plaintiff's vision acuity was 20/30 OD and 20/25 OS. (*Id.*, p. 154). Dr. Magie concluded, "[t]ype 2 diabtes with proliferative diabetic retinopathy without macular edema: both eyes, without macular edema, stable." (*Id.*).

Plaintiff returned to the Sparks Cardiology Center for a follow-up appointment on April 27, 2017. (ECF No. 15-7, p. 46). Dr. Adjei noted Plaintiff had dilated non-ischemic cardiomyopathy with an ejection fraction of less than 20%. (*Id.*, p. 48). Dr. Adjei recommended Plaintiff continue his current medical therapy with bisoprolol/HCTZ, carvedilol, furosemide, and

spironolactone, and he noted Plaintiff "is doing clinically well" and is in New York Heart Association Class II. (*Id*.). Dr. Adjei also noted Plaintiff is wearing a life vest and will schedule ACID placement "with repeat echo showing EF<20%." (*Id*.). Moreover, Dr. Adjei expressed Plaintiff "remains compliant with his medications." (*Id*., p. 51).

Dr. Adjei diagnosed Plaintiff with the following: cardiomyopathy; congestive heart failure; coronary arteriosclerosis; tachycardia; edema; hyperlipidemia; and diabetes mellitus. (ECF No. 15-7, p. 58). Specifically, Dr. Adjei stated Plaintiff's congestive heart failure and tachycardia had improved. (*Id*.). According to Dr. Adjei, Plaintiff's edema "improved tremendously," and Plaintiff lost over 40 pounds since his initial visit. (*Id*.). Plaintiff was noted to have angiographically normal coronary arteries; his hyperlipidemia was a chronic, but stable condition; and he had "[t]ype 2 diabetes mellitus without complications." (*Id*.). Plaintiff's ICD interrogation did not show any evidence of cardiac arrhythmias, except a short episode of non-sustained ventricular tachycardia, which did not require therapy. (*Id*., p. 51). Dr. Adjei opined that Plaintiff was "[c]linically improved. Now in New York heart association class II. He is doing very well with the current regimen." (*Id*., p. 52). Plaintiff continued to have an ejection fraction less than 20%. (*Id*.).

Plaintiff was seen at the Magie Mabrey Hughes Eye Clinic on May 3, 2017, for a follow-up appointment. (ECF No. 15-7, p. 156). Plaintiff stated his diabetes had been fairly well controlled lately. (*Id*.). Additionally, Plaintiff expressed his vision "seems to be gradually worsening and that he considers his vision only a minor nuisance." (*Id*.). Plaintiff complained of visual problems but "does not currently wear glasses or contact lenses." (*Id*.). Plaintiff's vision was 20/30 OD and 20/40 OS. (*Id*., p. 157). Dr. Mabrey concluded Plaintiff has type 2 diabetes with proliferative diabetic retinopathy without macular edema. (*Id*.).

10

Plaintiff returned to the eye clinic on May 22, 2017, for another follow-up appointment. (ECF No. 15-7, p. 159).  Plaintiff stated his vision seems to be unchanged, and he described his vision as blurry but had no other complaints.  (*Id*.).  Plaintiff's visual acuity was 20/25 OD and 20/100 OS.  (*Id*., p. 160).  Dr. Magie's impression of Plaintiff was "[t]ype 2 diabetes with proliferative diabetic retinopathy without macular edema: both eyes, without macular edema, stable."  (*Id*.).

On June 13, 2017, Plaintiff went to the Cornerstone Family Medical Clinic for congestive heart failure and an A1C check.  (ECF No. 15-8, p. 11).  Plaintiff reported weight loss of seven pounds, dizziness, headaches, and blurred vision.  (*Id*, p. 13).  Plaintiff's home blood sugar range was high, and he did not take aspirin daily.  (*Id*.).  He reported no dizziness, no lightheadedness, no chest pain, no shortness of breath, no palpitations, no edema, and no calf pain with exertion. (*Id*.).  Plaintiff was taking medications as directed with no side effects.  (*Id*.).  Dr. Carney opined that Plaintiff's eyes had no irritation, floaters, discharge, dry eyes, pain in the eyes, sensitivity to light (photophobia), or seeing double (diplopia) and visual changes.  (*Id*., p. 14).  Dr. Carney also noted depression, anxiety, and no irritability; however, Dr. Carney stated Plaintiff had a normal mood and affect, and he was active and alert.  (*Id*.).  Plaintiff's heart auscultation was normal S1 and S2, no murmurs, or gallops, and he had a regular heart rate and rhythm and tachycardia.  (*Id*.). Plaintiff was ambulating normally, with normal movement of his head and neck, no inflammatory conditions, and no edema.  (*Id*.).  Dr. Carney diagnosed Plaintiff with congestive heart failure (unspecified), essential (primary) hypertension, type 2 diabetes mellitus without complications, and anxiety disorder, unspecified.  (*Id*.).

During another visit to the eye clinic on June 23, 2017, Plaintiff stated his vision seemed to be gradually worsening, but that he considered his vision only a minor nuisance.  (ECF No. 15-

7, p. 162).  He described his vision as blurry and distorted.  (*Id*.).  Plaintiff did not wear glasses or contact lenses.  (*Id*.).  His visual acuity was 20/30 OD and 20/30 OS.  (*Id*., p. 163).  Dr. Magie again diagnosed Plaintiff with, "[t]ype 2 diabetes with proliferative diabetic retinopathy without macular edema: both eyes, without macular edema, stable."  (*Id*.).

Plaintiff returned to the Cornerstone Family Medical Clinic on July 3, 2017.  (ECF No. 15-8, p. 6).  Ai-Chau Nguyen, FNP, noted Plaintiff's blood pressure was elevated during visit, but Plaintiff was reportedly doing well with his current regimen for his congestive heart failure.  (*Id*., p. 10).  Plaintiff had lack of sleep, high blood pressure, and an increased heart rate, which may have been due to his sleep apnea.  (*Id*.).  Plaintiff was supposed to be wearing a CPAP machine at night, but he did not do so due to dental pain.  (*Id*.).  Plaintiff did not have a CPAP machine at the time of the visit, and Nurse Nguyen stated, "[w]ill get with American Home Patient to set up CPAP."  (*Id*.).  Nurse Nguyen observed Plaintiff's major depressive disorder as "recurrent, moderate."  (*Id*.).

During his visit to the eye clinic on August 8, 2017, Plaintiff stated his diabetes has been poorly controlled lately.  (ECF No. 15-7, p. 165).  He stated his vision seemed to be unchanged and blurry, but his visual problems only affected his ability to read small print and he did not wear glasses or contact lenses.  (*Id*.).  He complained of floaters without any flashing lights in his left eye, and he stated the floaters are an aggravating problem and most noticeable when reading.  (*Id*.).  Plaintiff also expressed that the floaters seemed to be fairly stable since the onset and he had no other complaints.  (*Id*.).  Plaintiff's visual acuity was 20/30 OD and 20/30 OS.  (*Id*., p. 166).  Once again, Dr. Mabrey's impression was, "[t]ype 2 diabetes with proliferative diabetic retinopathy without macular edema: both eyes, without macular edema, stable."  (*Id*., p. 167).

12

On October 3, 2017, Plaintiff was seen at the Cornerstone Family Medical Clinic for a three-month follow-up appointment for his essential hypertension and diabetes mellitus. (ECF No. 15-8, p. 2). Nurse Nguyen assessed Plaintiff with low back pain; diabetes mellitus; essential hypertension; congestive heart failure; cardiomyopathy; hyperlipidemia; depressive disorder; and morbid obesity. (*Id*., pp. 5-6.). Plaintiff's blood pressure was reasonably under control, and he had "an EF of less than 20%. Doing well with current regiment. F/U with cardiology." (*Id*., p. 6). Plaintiff's depressive disorder was stable. (*Id*.). He had gained two pounds since his last visit, and the need to limit fat, salts, carbs, and to increase his level of activity as tolerated was discussed. (*Id*.). Plaintiff was reportedly compliant in taking medications as directed for anxiety and depression. (*Id*., p. 69). Plaintiff also revealed he was not taking aspirin daily due to retinopathy with hemorrhages. (*Id*.). Regarding Plaintiff's obstructive sleep apnea, he reported morning headaches, excessive sleepiness during the day, suddenly falling asleep during the day, and excessive napping. (*Id*.). Plaintiff stated he had not received his CPAP machine and was "suppose[d] to meet with them today." (*Id*.). Plaintiff also reported no irritability or thoughts about suicide, depression, and anxiety. (*Id*., p. 70). Nurse Nguyen assessed Plaintiff with low back pain; type 2 diabetes mellitus with proliferative diabetic retinopathy with macular edema; essential hypertension; congestive heart failure, with an ejection fraction of less than 20%; cardiomyopathy; hyperlipidemia; depressive disorder; and morbid obesity. (*Id*., pp. 70-71).

On December 12, 2017, Plaintiff presented for a psycho-social assessment at Fort Smith Behavioral Health. (ECF No. 15-8, pp. 78-79). During the evaluation, Plaintiff reported an extensive history of medical complaints that have caused significant vocational impairments. (*Id*., p. 78). Additionally, Plaintiff reported "an extensive history of psychotropic treatment that started roughly two years ago." (*Id*.). Stephen D. Chiovoloni, LCSW, noted that the Substance Abuse

Subtle Screening Inventory 4 identified Plaintiff as having a high probability for prescription drug abuse. (*Id*., p. 79). Plaintiff reported an extensive history of depressive symptoms over a two-year period. (*Id*.). Moreover, Plaintiff stated he was having symptoms consistent with poor sleeping and eating patterns, a general feeling of fatigue, and low self-esteem. (*Id*.). He presented with good grooming, personal hygiene, and his eye contact remained consistent, but stated he was feeling both depressed and anxious. (*Id*.). Mr. Chiovoloni found Plaintiff "a 34-year-old, single, Asian, male currently being diagnosed with Persistent Depressive Disorder, Anxiety Disorder and Panic Disorder." (*Id*.). He also noted some substance use issues, due to chronic pain, "that will need to be clarified during treatment episode." (*Id*.). Mr. Chiovoloni concluded, "[m]edical necessity for treatment had not been established as evidenced by both social and vocation impairments." (*Id*.).

Plaintiff saw Dr. Carney on December 22, 2017, and he was again assessed with essential hypertension, congestive heart failure, major depressive disorder, type 2 diabetes mellitus without complications, and anxiety disorder. (ECF No. 15-8, pp. 63-66). On March 13, 2018, he returned for blood work and a checkup. (*Id*., p. 60). Dr. Carney determined Plaintiff had no irritation or floaters in his eyes; he also found no discharge, dry eyes, pain in the eyes, sensitivity to light, or seeing double and visual changes. (*Id*., p. 62). Dr. Carney diagnosed Plaintiff with essential hypertension, hyperlipidemia, and type 2 diabetes mellitus without complications. (*Id*., p. 63).

On April 26, 2018, Plaintiff had a one-year follow-up appointment for his cardiomyopathy. (ECF No. 15-8, p. 56). Dr. Adjei noted the following:

> Mr. Thammavong is here today for follow up. Past medical history has been reviewed from previous encounter as listed above. He tells me he is feeling good overall. He has felt tired some days, but overall seems to be doing. He is feeling better with the Entresto. EKG today shows sinus rhythm rate of 88. (*Id*., p. 58).

Dr. Adjei found no eye pain, redness, itchiness, swelling, or discharge, no blurry vision, and normal movement.  (*Id*., p. 59).  No chest pain or palpitations were noted, and Plaintiff's heart rate was normal.  (*Id*.).  Dr. Adjei also noted no depression, anxiety, insomnia, stress, or loss of interest.  (*Id*.).  Dr. Adjei assessed Plaintiff with cardiomyopathy; congestive heart failure; coronary arteriosclerosis; essential hypertension; hyperlipidemia; diabetes mellitus; obstructive sleep apnea syndrome; and morbid obesity.  (*Id*., pp. 59-60).  Dilated non-ischemic cardiomyopathy with ejection fraction less than 20% was also documented.  (*Id*., p. 59).  Dr. Adjei commented that Plaintiff was doing well and ordered him to continue with Carvedilol, Entresto, Furosemide, and Spironolactone.  (*Id*.).  According to Dr. Adjei, Plaintiff's congestive heart failure had improved, and Plaintiff was in New York Heart Association class II.  (*Id*.).  Dr. Adjei felt that Plaintiff was doing very well with the current regimen and advised him to continue with his medications.  (*Id*.).  Plaintiff's blood pressure was reasonably well controlled, and his diabetes mellitus was noted to be without complications.  (*Id*., p. 60).  A review of an electrocardiogram taken on April 26, 2018, showed a normal sinus rhythm 88 rate.  (*Id*.).

On May 9, 2018, Dr. Carney stated, "[p]t needs [e]cho for disability for CHF and note for 6 months."  (ECF No. 15-8, p. 52).  Dr. Carney assessed Plaintiff with congestive heart failure, noting "US, [e]chocardiogram," morbid obesity, type 2 diabetes mellitus without complications, and essential hypertension.  (*Id*., p. 55).

When Plaintiff returned on September 10, 2018, Dr. Carney noted depression, anxiety, but no irritability.  (ECF No. 15-8, p. 51).  Plaintiff reported no chest pain, arm pain, or exertion and shortness of breath when walking, however, Plaintiff's home blood sugar range was high.  (*Id*.).  Plaintiff's mood and affect were normal; he was active and alert. (*Id*.).  He ambulated normally, had no inflammatory conditions, and had no edema.  (*Id*., pp. 51-52).  Dr. Carney assessed Plaintiff

with type 2 diabetes mellitus without complications, cardiomyopathy, major depressive disorder, morbid obesity, and osteoarthritis. (*Id*., p. 52).

On December 10, 2018, Dr. Carney completed a physical medical source statement. (ECF No. 15-8, pp. 88-91). Dr. Carney opined Plaintiff could frequently lift and/or carry less than 10 pounds 1/3 to 2/3 of a typical eight-hour workday; could occasionally lift and/or carry less than 10 pounds 1/3 to 2/3 of a typical eight-hour workday; could stand/or walk a total of two hours in an 8-hour workday; could sit a total of two hours in an eight-hour workday; his ability to push and/or pull was limited in the upper extremities; and he would require five or more work breaks/bathroom breaks in an eight-hour workday and must elevate his lower extremities, sitting or supine, three times per day. (*Id*., p. 88). Dr. Carney further stated that Plaintiff must lay in a supine position for a total of two hours per eight-hour workday. (*Id*., p. 89). Based upon the totality of Plaintiff's symptoms in combination, including side effects of medication, Dr. Carney concluded Plaintiff could only perform work activities for a total of two hours in a normal workday. (*Id*.). Plaintiff could climb, balance, squat, kneel, crouch, bend, and stoop for less than two hours in an eight-hour workday. (*Id*.). Plaintiff could reach in all directions, handle, finger, grip, and feel for two hours out of eight-hour workday. (*Id*.). Dr. Carney further opined that Plaintiff should avoid all exposure to extreme cold or heat, wetness or humidity, noise or vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (*Id*., p. 90). Dr. Carney also advised limiting Plaintiff to driving less than 2/3 of a workday. (*Id*.). Dr. Carney concluded that Plaintiff could not perform the following functions: sit for six hours of an eight-hour workday; sit/stand/walk in combination for eight hours in an eight-hour workday; perform part-time work activities of any nature for more than ten hours in a forty-hour work week; and he would require four or more unscheduled work breaks in an eight-hour workday due to physical restrictions. (*Id*., p. 91).

On the same day, Dr. Carney completed a Mental Residual Functional Capacity Assessment. (ECF No. 15-8, p. 92). In this assessment, Dr. Carney opined that Plaintiff could not complete a normal workday and workweek without interruptions from psychologically based symptoms. (*Id.*). Dr. Carney also concluded that Plaintiff could not perform at a consistent pace without an unreasonable number and length of rest periods and could not consistently perform at a normal pace productively in work settings. (*Id.*).

## IV.    Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ erred in failing to fully and fairly develop the record; (2) whether the ALJ erred at step two, resulting in errors at step four of the sequential analysis in his performance of the psychiatric review technique ("PRT") and evaluation of Plaintiff's vision impairment; (3) whether the ALJ failed to properly evaluate the Plaintiff's subjective complaints and apply the *Polaski* factors; and, (4) whether the ALJ erred in his RFC determination. (ECF No. 17). After thoroughly reviewing the record, we find that the ALJ failed to develop the record fully and fairly, and therefore, it does not provide substantial evidence to support the ALJ's RFC finding. Because this failure already necessitates reversal and remand, it is not necessary for the undersigned to address the Plaintiff's remaining arguments.

### A.    Development of the Record

Plaintiff claims the ALJ erred by failing to develop the record fully and fairly. (ECF No. 17, pp. 4-6). Specifically, Plaintiff argues the ALJ's vision severity determination was inconsistent with the State Agency eCAT findings of severity. (*Id.*, p. 5). Plaintiff also asserts the ALJ's mental PRT did not include discussion of two sources familiar with Plaintiff's major depressive disorder, and that the ALJ should have ordered a consultative psychiatric/psychological evaluation. (*Id.*, pp. 5-6). Additionally, Plaintiff claims his ejection fraction was listing level under Listing 4.02,

and a medical evaluation or consultative evaluation is necessary to further evaluate this component of Plaintiff's disability claim. (*Id.*, p. 6).

In determining whether the ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *Haley v. Massanari,* 258 F.3d 742, 749-50 (8th Cir. 2001). "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998). Moreover, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id*. While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Here, the non-examining state agency consultative examinations determined at the initial and reconsideration levels that Plaintiff had no visual limitations. (ECF No. 15-3, pp. 12, 26, 42, 58). During the relevant period, Plaintiff was diagnosed with proliferative diabetic retinopathy without macular edema in both eyes. (ECF No. 15-7, p. 167). This form of diabetic retinopathy is severe and laser treatment prevents blindness, but often some vision is lost. *See* Proliferative Retinopathy, *http://diabeticretinopathy.org.uk/proliferative.html* (last visited March 10, 2021). At the hearing, it was revealed that Plaintiff last visited his ophthalmologist at Magie Mabrey Hughes Eye Clinic in August 2017. (ECF No. 15-2, p. 64). The ALJ queried Plaintiff, "[h]ow is your vision right now?" Plaintiff responded, "[i]t's good right now." (*Id.*, p. 56). However, Plaintiff further testified his vision was "blurry right now." (*Id.*, p. 64). The ALJ asked

Plaintiff about his visit to Malcolm Hutchins, O.D., at Vision Care Associates in 2017, and whether he was told to go back to Magie Mabrey Hughes Eye Clinic for further treatment. (*Id*., p. 65). Plaintiff responded, "[n]o sir, money, money issues came up and I was behind on payments." (*Id*., p. 65). Considering Plaintiff's diagnosed vision impairment, the ALJ never re-contacted Plaintiff's ophthalmologists for a follow-up examination from the time of his last visit in August 2017 up until the date of the ALJ's decision in May 2019.

In his decision, the ALJ considered Plaintiff's non-ischemic cardiomyopathy and cardiomegaly under Listing 4.02, but the ALJ concluded that Plaintiff's condition did not satisfy the severity requirements. (ECF No. 15-2, p. 17). Before and during the relevant period, Plaintiff consistently had an ejection fraction of less than 20%. (ECF No. 15-7, pp. 48, 60). On April 26, 2018, Plaintiff was assessed with dilated non-ischemic cardiomyopathy "with ejection fraction less than 20%." (ECF No. 15-8, p. 59). At the hearing, Plaintiff testified he was still waiting for approval from his insurance to check his ejection fraction again. (ECF 15-2, p. 61). Plaintiff revealed the last ejection fraction measured 20% and had not been measured since then. (*Id*.). According to the record, from April 26, 2018, until May 22, 2019, the date of the ALJ's decision, there still had not been an updated assessment from Plaintiff's cardiologist measuring Plaintiff's current ejection fraction level. (ECF 15-2, pp. 23, 78).

At the initial and reconsideration levels, non-examining state agency consultants determined Plaintiff's depressive, bipolar, anxiety and obsessive-compulsive disorders were medically determinable impairments. (ECF No. 15-3, pp. 9-10, 23-24, 39, 55). Plaintiff's treating physician, Dr. Carney, opined Plaintiff could not complete a normal workday and workweek without interruptions from psychologically based symptoms. (ECF No. 15-8, p. 92). The ALJ cited Dr. Carney's mental assessment, however, he found it to be unpersuasive. (ECF No 15-2, p.

21).   The ALJ did not discuss Plaintiff's visit in December 2017 to Fort Smith Behavioral Health. (ECF No. 15-2, pp. 14-23; ECF No. 15-8, pp. 78-79).   The therapist, Mr. Chiovoloni, stated Plaintiff was feeling both depressed and anxious, and Plaintiff was diagnosed with Persistent Depressive Disorder, Anxiety Disorder, and Panic Disorder.  (ECF No. 15-8, p. 79).  The ALJ also did not mention Plaintiff's testimony at the hearing that while his mental state had improved, he could no longer afford to go back to counseling.  (ECF No. 15-2, pp. 14-15, 57-58).

By rejecting the treating source opinions and failing to obtain a consultative examination, the ALJ had to rely solely on his inferences about notations in the Plaintiff's medical records and their relevance to his ability to function in the workplace.  *See McCurry v. Saul*, No. 2:20-CV-02004-PKH-MEF, 2021 WL 313630, at *14 (W.D. Ark. Jan. 14, 2021), report and recommendation adopted, No. 2:20-CV-02004, 2021 WL 310938 (W.D. Ark. Jan. 29, 2021).  As such, the ALJ failed to develop the record fully and fairly, and therefore, the record does not provide substantial evidence to support the ALJ's decision, and the case must be reversed and remanded.

On remand, the ALJ is directed to order a psychiatric/psychological consultative evaluation, to include a detailed RFC assessment of Plaintiff's mental limitations.  Additionally, the ALJ is directed to re-contact Plaintiff's treating ophthalmologist, Dr. Magie, to request an updated report regarding Plaintiff's vision and an RFC assessment of Plaintiff's vision impairment.  If Dr. Magie is unable or otherwise unable to complete the RFC assessment, then the ALJ is directed to order a consultative ophthalmological examination, complete with a detailed RFC assessment.  Finally, the ALJ is directed to re-contact Plaintiff's cardiologist, Dr. Adjei, to request an updated report, including a current assessment of Plaintiff's ejection fraction, and to include an RFC assessment of Plaintiff's cardiological impairment.  Should Dr. Adjei be unable or otherwise

unable to complete the RFC assessment, then the ALJ is directed to order a consultative examination by a cardiologist, complete with a detailed RFC assessment.

With this additional information, the ALJ should reassess Plaintiff's RFC, considering all of Plaintiff's impairments, and conduct a thorough sequential evaluation analysis. Although the ALJ's decision may be the same after a proper analysis, a proper analysis must nonetheless occur. *Groeper v. Sullivan*, 932 F.2d 1234, 1239 (8th Cir. 1991).

## V.    Conclusion

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 17th day of March 2021.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE